UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X
                                  :

UNITED STATES OF AMERICA,          :       02-CV-2802 (ARR)

                 Plaintiff,     :

                                   :       AMENDED OPINION
    -against-                  :      AND ORDER

JAKIW PALIJ,                 :

               Defendant.    :

------------------------------------------------------------------- X

ROSS, United States District Judge:

      The government commenced this action pursuant to Section 340(a) of the Immigration

and Nationality Act of 1952 (INA), 8 U.S.C. § 1451(a), to revoke the citizenship of defendant

Jakiw Palij.  The government contends that defendant procured American citizenship illegally

by obtaining an immigrant visa to which he was not entitled.  By the government's account,

defendant served as a guard at a labor camp in Nazi-occupied Poland and as a member of

several Nazi-led units that committed atrocities against civilians during World War II.  By

motion dated July 8, 2003, the government moves for summary judgment.  For the reasons

given below, the motion is granted.

## I. BACKGROUND[1]

---

[1]The following background is culled mainly from the voluminous exhibits submitted by
the government.  Although at the summary judgment stage the court is obliged to view facts in
a light most favorable to the defendant, defendant's failure to offer anything more than his
objections to the government's Local Rule 56.1 statement compels the court to rely solely on
the government's submissions.  Furthermore, defendant's objections to the government's
claims of uncontested facts are nonspecific.  For example, in response to the government's
discussion of the partition of Poland between Nazi Germany and the USSR, defendant simply

A. General Historical Background

On September 1, 1939, Nazi Germany declared war on Poland.  Along with the then-Union of Soviet Socialist Republics (USSR), the Nazis conquered Poland by early October and partitioned the country into three parts.  The USSR annexed eastern Poland, Nazi Germany annexed western Poland, and the Nazis put the remaining portion, the "Government General," under German civilian control.  Pl. Ex. 14 [hereinafter Black Aff.] ¶ 13.  One part of the Government General, the Lublin District, was headed by Odilo Globocnik, a brigadier general in the Schutzstaffel (SS), the organization within the Nazi bureaucracy that played the chief role in the formulation and execution of the plan to annihilate European Jewry.  Id. ¶ 17; see also United States v. Kwoczak, 210 F. Supp. 2d 638, 641 (E.D.Pa. 2002).  Heinrich Himmler, the head of the SS, entrusted the implementation of this plan in the Government General, code-named "Operation Reinhard," to Globocnik.  Black Aff. ¶ 17.  The purposes of Operation Reinhard were fourfold: (1) to physically annihilate the Jews in Poland; (2) to utilize individual Jewish laborers where appropriate prior to their annihilation; (3) to seize property from Jews; and (4) to identify and secure hidden assets and immovable property belonging to murdered Jews.  Id. ¶ 18; see also Pl. Ex. 24 (Globocnik's report to Himmler, dated January 5, 1944).  According to Peter Black, a Holocaust historian who filed an affidavit

states, "Admits that Soviet Union and Nazi Germany occupied Poland but respectfully refers the Court to other historical materials that differ from the opinions of the [Office of Special Investigations] historian."  Def. Opp. to Local Rule 56.1 Statement ¶ 2.  No such materials are provided or cited.  At other times, defendant simply characterizes the government's allegations of facts as "an expression of opinion about history."  Id. ¶ 4.

2

in support of the government's motion, Operation Reinhard resulted in the murder of 1.7 million Jews. Black Aff. ¶ 18 n. 7.

B. Trawniki

To further the exploitation of Jewish labor, Himmler ordered the establishment of labor camps where Jews capable of working were concentrated, in part to insure their efficient supervision. Black Aff. ¶ 22. Camps were created at Trawniki and Poniatowa in the Lublin District for this purpose. Id. ¶ 25; Kwoczak, 210 F. Supp. 2d at 642. Trawniki's population, which started with about 700 inmates, Black Aff. ¶ 25, swelled to 6,000 by November of 1943.[2] Fritz Emil Schultz, entered into a contract with Globocnik in early 1943 to move a uniform and brush production plant to Trawniki. At the camp, Jews produced winter uniforms for the German military. Id. ¶ 54; see also Pl. Ex. 47 (statement of Schaul Ehrlich, a Trawniki inmate, describing the Jewish labor camp).

Trawniki served not only as a labor camp for Jews but also as a training camp at which Nazi recruits would be trained as guards for duty at other concentration camps, ghettos, and labor camps. Black Aff. ¶ 59; Kwoczak, 210 F. Supp. 2d at 642. The Herculean task required by Operation Reinhard of herding the 2,000,000 Jews in the Government General into concentration camps put strains on Nazi manpower, at a time when the Germans were

---

[2]On November 3 and 4, 1943, in a brutal spate of killing code-named "Operation Harvest Festival," the SS and auxiliary units slaughtered Trawniki's entire inmate population, along with tens of thousands of others in Poland. Black Aff. ¶ 92. Operation Harvest Festival, with a victim total of 42,000, has the ignoble distinction of having been "the single largest German killing operation against Jews in the entire war." Christopher Browning, Ordinary Men 135 (1998). Only the Romanian-perpetrated massacre of 50,000 Jews in October of 1941 exceeded Operation Harvest Festival's total. Id. at 136.

engaged in crucial battles on the Eastern Front in Russia.  <u>See</u> Christopher Browning,

<u>Ordinary Men</u> 50 (1998).  Globocnik relied heavily on Trawniki-trained guards for many of

the jobs the operation required.  Browning at 52; Black Aff. ¶ 22.  Most of the recruits were

Soviet prisoners-of-war and young men living in the Galicia, Krakow, and Lublin districts of

the Government General.  Black Aff. ¶¶ 27, 28.  According to the historian Christopher

Browning, "the Ukrainian, Latvian, and Lithuanian 'volunteers' . . . were screened on the

basis of their anti-Communist (and hence almost invariably anti-Semitic) sentiments . . . ."

Browning at 52.  Records from interrogations of former Trawniki guards conducted by Soviet

authorities after the war corroborate this description.  Many former guards reported signing a

statement indicating that they had not belonged to any communist organizations and that they

had no Jewish ancestors.  <u>E.g.</u>, Pl. Ex. 19-R; Pl. Ex. 19-W.  A personnel file from Trawniki

includes a copy of this oath.  Pl. Ex. 17-M.  By some accounts, however, these men did not

necessarily enlist at Trawniki voluntarily; rather, the Nazis threatened them and their families

with death or deportation to concentration camps to secure their service.  <u>E.g.</u>, Pl. Ex. 48; Pl.

Ex. 49, Pl. Ex. 52.[3]

---

[3]These exhibits include translations of statements given by Ukrainian men from
defendant's region in the Ukraine who trained at Trawniki.  The statements were given to
Soviet and Ukrainian government officers in the presence of Canadian officials investigating
wartime collaboration in the late 1980s and mid-1990s.
 The government has also submitted transcripts of interrogations conducted by Soviet
prosecutors in the late 1940s and 1950s.  Upon the conclusion of the war and their return to
the Soviet Union, many Ukrainian men who trained at Trawniki and served in the German
military were prosecuted and sent to the gulag for treason.  <u>See e.g.</u>, Pl. Ex. 19-Z (Statement
of Mykola Ivanovych Nepyjvoda); Pl. Ex. 53 (Statement of Vasil Mikhajlovich Popelyuk); Pl.
Ex. 54 (Statement of Teodor Mykolajovych Turyanskyj).  In many of these interrogations, the
defendants admitted that they served at Trawniki voluntarily.  <u>See e.g.</u>, Pl. Ex. 19-P
(Statement of Dmitrij Mikhajlovich Korzhinskij).  However, given what is known of Stalinist

At Trawniki, recruits were trained to assist in the implementation of Operation
Reinhard. Black Aff. ¶ 59. Training, which lasted six to eight weeks, consisted of instruction
in military drill, in the use of weapons, and in guarding prisoners. Black Aff. ¶¶ 59, 60.
Also, as many of the guards admitted, their duties at Trawniki during training included
patrolling the Jewish labor camp and escorting Jews to work. Black Aff. ¶ 90;[4] Pl. Ex. 47 at 9
(statement of Schaul Ehrlich, a former Trawniki inmate, describing the guards at Trawniki as
"Ukrainians in black uniforms"). Speaking to Canadian officials in 1995, one former
Trawniki guard gave the following account of his life at Trawniki:

---

conceptions of due process, the court takes these statements with a grain of salt and does not
rely exclusively on them for any factual determination. Indeed, some of these statements
regarding the voluntariness of service contradict themselves. For example, one former
Trawniki guard stated that he "entered into service in the SS police training camp in Trawniki
voluntarily," and that "[i]n general, they only accepted volunteers there." However, he went
on to say that he was warned "that if [he] did not serve in the Security Police, [his] family and
[he] would be shot by the German command." Pl. Ex. 19-X. Questioned in 1995, one former
Trawniki guard stated that when he "was tried during the Stalinist period, a lot of facts were
falsified." Pl. Ex. 50. Nonetheless, Dr. Black, who compared statements made in these
records to other evidence, has found them "striking[ly] consisten[t] with known facts about
Trawniki service" and therefore worthy of serious consideration. Black Aff. ¶ 80.

[4]Dr. Black performed an exhaustive analysis of the dozens of records of interrogations
of Trawniki guards recovered from Soviet archives and concludes that the statements
concerning the guarding and escorting of Jews contained therein are reliable. See Black Aff. ¶
60. He observed that of the 62 men giving postwar statements, only 7 explicitly denied
guarding Jews. Id. ¶ 62. Dr. Black then compared accounts given in the postwar statements
with a number of other sources that are more intrinsically reliable, such as Canadian
statements taken in Ukraine in 1995 of former recruits, West German statements taken in the
1960s of a former recruit and several former German SS officials who served at Trawniki, and
wartime documentation created by German officers. Id. ¶ 83. He found that these sources
corroborate the guards who claimed to have guarded Jews.
    Other courts have determined that recruits at Trawniki guarded the Jewish labor camp.
See United States v. Hajda, 135 F.3d 439, 441 (7th Cir. 1998); United States v. Reimer, No.
92 Civ. 4638, 2002 U.S. Dist. LEXIS 26356, at *11 (S.D.N.Y. Sept. 3, 2002); United States
v. Kwoczak, 210 F. Supp. 2d 638, 643 (E.D.Pa. 2002).

5

> After we received our uniforms, they taught us how to stand in formation and identify ranks from epaulets . . . . We were issued safe-conduct numbers that we carried in our pockets. I had the number 3063 . . . . There was an oath to serve the Germans.
>
> We were taught how to use weapons and how to assemble and disassemble them. We were issued Russian rifles. There was a firing range, and we went there to shoot . . . . After that we were sent to guard bridges and camps and ourselves. The guard duty was in the area of Trawniki . . . . We guarded warehouses and stations . . . . We were taught how to stand guard at a guard post . . . .
>
> There were no prisoners of war in the camp. Jews were there. There was a fence along the side between our camp and the place where the Jews were. I do no know how many Jews there were, because we were not allowed to go where the Jews were inside. We only stood at our posts and guarded the camp grounds. The Jews had their own police guards. Sometimes the Germans went inside the camp. I stood on the other side of the fence, outside, so that nobody escaped. If anybody was escaping, we were supposed to shoot. The Germans ordered us to shoot, but nobody escaped. The Germans escorted the Jews to work. They were also escorted by [Ukrainian] guys like me. People from our company escorted Jews in turn . . . .

Pl. Ex. 49 (Statement of Omelyan Mykhaylovych Sendets'kyy). Reviewing dozens of statements from former Trawniki guards, Dr. Black concluded that "guarding the labor camp belonged to the training-period experience of Trawniki recruits . . . ." Black Aff. ¶ 90. The evidence in the record does not indicate, however, that the Trawniki recruits physically attacked the Jews or participated directly in Operation Harvest Festival. E.g., Pl. Ex. 19-H (interrogation of Vasylyy Ivanovych Futuluychuk, held on Dec. 6, 1989) (stating that the Trawniki recruits were confined to their barracks for the two days during which the Jews were liquidated); Pl. Ex. 19-Q (statement of Dmitro Mikhajlovich Korzhinskij, given in 1995) (same).

C. The Deployment Company

Once trained at Trawniki, guards were sent throughout the Government General to carry out Operation Reinhard and perform other tasks to support the German occupation of Poland. Black Aff. ¶ 59. These duties included, among others, implementing the infamous liquidation of the Warsaw Ghetto in 1943, as well as service at Treblinka and Sobibor.[5] Black Aff. ¶ 20; United States v. Reimer, 92 Civ. 4638, 2002 U.S. Dist. LEXIS 26356, at *28-29 (S.D.N.Y. Sept. 3, 2002). Some guards were assigned to the Lublin-based Deployment Company, Black Aff. ¶ 10, which, according to Dr. Black, "was involved in responding to reports of partisan activity and rounding up civilians in anti-partisan operations." Id. ¶ 100. Ivan Bogdanov, a former member of the Deployment Company, or Einsatzkompanie, Pl. Ex. 3 at 13, recalled in a statement made to Soviet authorities in 1948 that he and his comrades participated in "expeditions against the Polish partisans," which involved, among other activities, burning down suspected sympathizers' houses. Pl. Ex. 34 (Interrogation of Ivan Stefanovich Bogdanov, taken in 1948).

D. The Streibel Battalion

In 1944, the Soviet Army overran the Lublin District, where many of the Trawniki-trained men were stationed. Black Aff. ¶ 104. The men withdrew to the west, where many of them were organized into the SS Battalion Streibel, named for the former head of the Trawniki Camp, SS Major Karl Streibel. Id. The battalion participated in German resistance to further

---

[5]The majority of statements in the record from former Trawniki guards indicate that they did not directly participate in the killing of Jews at Trawniki and elsewhere but rather were assigned guard duty while Germans committed the murders. In contrast, historian Christopher Browning describes Trawniki guards as having directly participated in a number of heinous massacres. See e.g., Browning at 78-87.

The government alleges that defendant lied in an effort to secure an immigrant visa, and that in actuality he spent much of the war in the SS as a Trawniki-trained guard. On October 5, 2001, before this case commenced, a government investigator took a sworn statement from defendant in which he made the following declarations:

> 1. I went from my hometown in Ukraine to Trawniki training camp in April or March, 1943. I trained there for 2 or 3 months, and then was assigned to a farm or estate with 12 or 15 men in my group.
> 2. I received weapons right after training . . . .
> 3. I stayed on the estate until near the end of 1943, when I was sent to Lublin to train for combat.
> 4. I wore a black uniform at Trawniki, but later changed to a green uniform.
> 5. I was in the Streibel Battalion at the end of the war, and was in Dresden and elsewhere. I was in Dresden as part of a working battalion.
> 6. I was not in Warsaw during World War II or any other time.
> 7. I remember Nikolai Tkachuk and Nikolai Hutsulyak from my village, and I went with them to Trawniki from my hometown. We were trained by Zugwachmann. There was a Jewish labor camp next door.
> 8. In January or February , 1943, the Germans came and told us to report. All boys born from 1920-1924 were told to report. We reported to Kolomea.
> 9. After a few weeks, we were told to report again. We did not know where we were going. We were sent to Trawniki.

Pl. Ex. 2. At a deposition, defendant refused to answer any questions about his alleged stint at Trawniki, his alleged service at a prison farm, his alleged time with the Deployment Company, and his alleged service with the Streibel Battalion. E.g., Pl. Ex. 13 at 83, 87, 89, 90. To each question, on the advice of his lawyer, he responded, "I decline to answer on the grounds that the answer might tend to incriminate me."

The government submitted five volumes of documents to support its claim that defendant did in fact serve in the SS. A number of records from interrogations of former Trawniki guards corroborate defendant's sworn statement that the Germans required young Polish and Ukrainian men to report to Kolomyya for induction at Trawniki in late 1942 and

9

early 1943.  E.g., Pl. Ex. 19-Q (statement of Korzhinskij, given in 1995); Pl. Ex. 19-Z

(statement of Nepyjvoda, given in 1995); Pl. Ex. 20-A (statement of Aleksandruk, given in

1995); see also Black Aff. ¶ 30 (describing the German recruitment of Galician young men for

service at Trawniki in early 1943).  In statements given in 1948 and 1989, one former guard

from defendant's hometown, Mykola Stepanovych Hutsulayk,[6] identified defendant as among

those from Piadyki inducted at Trawniki.  Pl. Ex. 9 (statement of Gutsulyak, given in 1948);

Pl. Ex. 11 (statement of Hutsulayk, given in 1989).[7]  Defendant also remembered Hutsulayk

as among his comrades at Trawniki.  The personnel files of both Hutulayk and Nikolai

Tkachuk, another comrade defendant recalled as having accompanied him to Trawniki,

corroborate that Piadyki men were at the camp in early 1943.  Pl. Ex. 17-U; Pl. Ex. 17-V.

Based on this and other evidence, Dr. Black reached the following conclusion:

> Jakiw Palij, as a Trawniki man in training from on or about February 13 until at
> least April 15, 1943, guarded the Trawniki Labor Camp and its Jewish
> prisoners on several occasions as part of the normal duties of a Trawniki recruit
> in training.  Whenever he was deployed to this duty, Palij, in accordance with
> usual procedures established by the SS and police leadership of the Trawniki
> Training Camp for the Trawniki-trained guards, carried a rifle with live
> ammunition and had instructions to use his firearm to prevent any prisoner from
> attempting to escape.

Black Aff. ¶ 91.

---

[6]He is also referred to as Nicolaj Stepanovich Gutsulyak.  Pl. Ex. 10.

[7]Another former Trawniki guard, Dmitrij Mikhajlovich Kobyletskij, recalled in a
statement given to Soviet authorities in 1948 that someone named "Yakov or Fedor Palij" from
Piadyki was among the recruits at Trawniki.  The circumstances under which this statement
was given - during Soviet interrogation - and its inconsistencies with defendant's sworn
statement - Kobyletskij claimed that defendant participated in the Warsaw ghetto liquidation -
render its credibility more doubtful.

A roster of the Deployment Company dating from March of 1944 includes defendant's name, followed by identification number 3505. Pl. Ex. 3 at 4.[8] Among the other men listed in the roster is Mykola Wasylyk, who was denaturalized in 2001. See Id. at 7; see also United States v. Wasylyk, 162 F. Supp. 2d 86 (N.D.N.Y. 2001). In 1957, Wasylyk served as a character witness in support of defendant's application for naturalization, Pl. Ex. 1 at 4, and, judging from the frequency of telephone calls between defendant and Wasylyk in the 1990s and the entry bearing Wasylyk's name in defendant's address book, it appears that defendant and Wasylyk remain in fairly close communication. Pl. Ex. 56 (telephone call log, recording 69 calls from defendant to Wasylyk between 1993 and 2002); Pl. Ex. 55 (defendant's address book). Finally, defendant is listed in several rosters of the Streibel Battalion. He is referred to as an "SS Oberwachmann" (Guard Private First Class) and identified by the same number. Pl. Ex. 4 at 6; Pl. Ex. 5 at 4; Pl. Ex. 6 at 6; Pl. Ex. 7 at 3.

> With this and other evidence in mind, Dr. Black concluded that
>
> Jakiw Palij, the defendant, served as an armed guard of civilian prisoners at a forced-labor camp for Jews at Trawniki in the period between on or about February 13, 1943 and at least April 15, 1943, assisted in preventing prisoner escapes and, in the activity of preventing prisoner escapes, assisted in forcing them to work. I further conclude that Jakiw Palij performed armed guard service in the Deployment Company in early 1944 and in the 1st Company of the SS Battalion Streibel in autumn and winter 1944-45.

Black Aff. ¶ 129. It is upon this conclusion that the government instituted this action.

## II. DISCUSSION

The government argues that this uncontradicted evidence compels summary judgment

---

[8]Defendant's name appears in the same roster as what appears to be Ivan Bogdanov's. Bogdanov is referred to as "Johann Bodonow." Pl. Ex. 3 at 8.

in its favor on the four counts alleged in the complaint, namely, that defendant assisted in the persecution of civilians, that he participated in a movement hostile to the United States, that he willfully and materially misrepresented his wartime service to the DPC, and that he acquiesced in conduct contrary to human decency. Defendant, who does not concede any of the alleged facts of his history as a Trawniki guard, insists that summary judgment is not appropriate when facts are contested and that a "trial is necessary to dispel serious doubts on critical issues." Def. Mem. at 6.

A. Summary Judgment Standard

When a party moves for summary judgment, judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists." Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994). "On summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion," United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994 (1962), but the non-moving party "must do more than show there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986). In making the necessary showing, "[c]onclusory allegations [by the non-moving party] will not suffice to create a genuine issue." Delaware & Hudson Ry. v. Consolidated Rail Corp., 902 F.2d 174, 178 (2d Cir. 1990). A "genuine" issue is one that could be decided in favor of the

12

non-moving party based on the evidence by a reasonable jury. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986). The role of the court in deciding a motion for summary judgment is not to decide issues of fact, but only to determine whether or not they exist. <u>Rattner v. Netburn</u>, 930 F.2d 204, 209 (2d Cir. 1991).

As the Supreme Court noted in <u>Fedorenko v. United States</u>, "the right to acquire American citizenship is a precious one, and . . . once citizenship has been acquired, its loss can have severe and unsettling consequences." 499 U.S. 490, 505, 101 S. Ct. 737, 66 L. Ed. 2d 686 (1981). Elsewhere Justice Brennan observed that "citizenship is a most precious right, and as such should never be forfeited on the basis of mere speculation or suspicion." <u>Kungys v. United States</u>, 485 U.S. 759, 783-84, 108 S. Ct. 1537, 99 L. Ed. 2d 839 (1988) (Brennan, J., concurring). Accordingly, evidence justifying revocation of citizenship must be "clear, unequivocal, and convincing." <u>Schneiderman v. United States</u>, 320 U.S. 118, 125, 63 S. Ct. 1333, 87 L. Ed. 1796 (1943).

B. Relevant Legal Background

The Displaced Persons Act of 1948 (DPA), ch. 647, 62 Stat. 1009, 1014 (1948), <u>attached</u> as Pl. Ex. 59, enabled eligible European refugees, or "displaced persons," to immigrate to the United States after the war notwithstanding American immigration quotas. <u>United States v. Sokolov</u>, 814 F.2d 864, 868 (2d Cir. 1987). Section 2(b) of the DPA incorporated the definition of "displaced person" as found in Annex I of the Constitution of the International Refugee Organization (IRO). Pl. Ex. 59 at 1. This definition excluded "war criminals, quislings, and traitors" or any person who had "assisted the enemy in persecuting civil populations." IRO Constitution §§ 1, 2(a), <u>reprinted</u> <u>in</u> IRO, <u>Manual for Eligibility</u>

13

Officers 31, 33, <u>attached</u> <u>as</u> Pl. Ex. 58.  "An ineligible person was considered to be not 'of

concern' to the IRO, and an applicant not 'of concern' to the IRO was ineligible for a United

States visa under DPA § 2(a)."  <u>Sokolov</u>, 814 F.2d at 868.  Section 10 of the DPA put the

burden of proof on the applicant to establish his or her eligibility under the act and provided

that "[a]ny person who shall willfully make a misrepresentation for the purpose of gaining

admission into the United States as an eligible displaced person shall thereafter not be

admissible into the United States."  DPA § 10, <u>attached</u> <u>as</u> Pl. Ex. 59.  Also, Section 13 of the

DPA stated that "[n]o visas shall be issued under the provisions of this Act to any person who

is or has been a member of, or participated in, any movement which is or has been hostile to

the United States or the form of government of the United States."  <u>Id.</u> § 13.

A person seeking to secure an immigrant's visa pursuant to the DPA was interviewed

by a member of the DPC, who made a preliminary determination of their eligibility.  <u>Sokolov</u>,

814 F.2d at 869.  Having received DPC approval, an applicant was then passed to a State

Department vice consul for further review.  DeCapua Aff. ¶ 17.  If the vice consul approved

the application, the person received a visa.  In 1949, the State Department promulgated

regulations to instruct vice consuls regarding visa eligibility.  These regulations provided for

the following:

> 53.32.  Refusal of Permission to Enter.
>      (a) No permit to enter shall be issued to any alien if the permit-issuing
> authority has reason to believe that the entry of the alien would be prejudicial to
> the interests of the United States.
> 53.33.  Classes of Aliens Whose Entry is Deemed to be Prejudicial to the
> Public Interest.
>      The entry of an alien who is within one of the following categories shall
> be deemed to be prejudicial to the interests of the United State . . .

14

(j) . . . who has advocated or acquiesced in activities or conduct contrary to civilization and human decency on behalf of the Axis countries during . . . [World War II] . . . .

22 C.F.R. §§ 53.32, 53.33 (1949), attached as Pl. Ex. 57.

Section 340(a) of the INA requires revocation of citizenship that was "illegally procured or . . . procured by concealment of a material fact or by willful misrepresentation." 8 U.S.C. § 1451(a). Since defendant entered the United States pursuant to a visa obtained under the DPA, his eligibility for that visa determines the legality of his citizenship. See 8 U.S.C. § 1427(a)(1); United States v. Breyer, 41 F. 3d 884, 889 (3d Cir. 1994); see also United States v. Dailide, 316 F.3d 611, 616 (6th Cir. 2003) ("[I]f an alien was never eligible for displaced person status, he was never 'lawfully admitted' and his visa is invalid. He therefore 'illegally procured' his citizenship, since no alien can be legally naturalized without a valid visa."). The government contends that, because defendant was prohibited by Sections 2(b) and 13 of the DPA from receiving an immigrant visa, his citizenship was "illegally procured," requiring his denaturalization. See 8 U.S.C. § 1427(a)(1)(listing as one of the prerequisites for naturalization the lawful admittance for permanent residence, i.e., the legal procurement of a visa).

## C. Illegal Procurement

### 1. Assistance in Persecution

The government contends that defendant illegally procured his immigrant visa because his service at Trawniki, in the Deployment Company, and in the Streibel Battalion rendered him ineligible for a visa under the DPA. If true, defendant's alleged service at Trawniki guarding the Jewish labor camp constituted assistance in persecuting a civilian population as

15

defined in Section 2 of the DPA.  "Courts have uniformly concluded that service as an armed guard at a forced-labor or concentration camp constitutes assistance in the Nazi program of persecution, regardless of whether the defendant himself personally injured or killed any victims." Wasylyk, 162 F. Supp. 2d at 93; see also Reimer, 2002 U.S. Dist. LEXIS 26356, at *28; Breyer, 41 F.3d at 890; United States v. Schmidt, 923 F.2d 1253, 1258 (7th Cir. 1991) ("[I]t is clear that service as an armed concentration camp guard constitutes assisting in persecution under the DPA."); United States v. Hutyrczyk, 803 F. Supp. 1001, 1009 (D.N.J. 1992).  As one court put it,

> The mere presence of the watchful eye of the conqueror or his deputies, coupled with the often demonstrated presence of both the mens and the inclination to persistently inflict various indignities . . . is the personification of mental persecution to anyone, let alone innocent civilian[s] . . . reduced to various degrees of substandard mental and physical well-being.

United States v. Osidach, 513 F. Supp. 51, 90 (E.D.Pa. 1981).  As another court noted in finding that the fact of a guard's service alone satisfied the assisting persecution requirement, "[w]ithout individuals guarding the perimeter of the camp at night, ensuring that no Jew escaped, the cruel treatment would not have been able to continue." Hutyrczyk, 803 F. Supp. at 1010.  Whether defendant served voluntarily or involuntarily makes no difference. Fedorenko, 449 U.S. at 512 ("[A]n individual's service as a concentration camp armed guard - whether voluntary or involuntary - made him ineligible for a visa.").

The government has marshaled convincing evidence that defendant indeed served as an armed Trawniki guard, and that this service resulted in the persecution of civilians.  By his own sworn statement he admitted to his tenure at the camp, acknowledging that there was a Jewish labor camp nearby.  Testifying both in 1948 and 1989, an acquaintance from his village

16

who accompanied him to Trawniki recalled his presence among the Trawniki recruits. Defendant's name appears on a number of rosters along with a number of other Trawniki-trained men. Other documentary evidence corroborates the government's contention that the Nazis undertook a recruiting drive in defendant's part of Galicia in late 1942 and early 1943. Finally, in response to questioning at his deposition, defendant invoked the Fifth Amendment. This being a civil proceeding, the court draws a negative inference against him on account of his refusal to discuss questions relating to his service at Trawniki and finds that his silence further corroborates the allegation of his service. See Baxter v. Palmigiano, 425 U.S. 308, 318, 47 L. Ed. 2d 810, 96 S. Ct. 1551 (1976); see also Goodridge v. Harvey Group, Inc., 778 F. Supp. 115, 122-23 (S.D.N.Y. 1991) (drawing an adverse inference against a party who invoked the Fifth Amendment in a deposition). See United States v. Stelmokas, 100 F.3d 302, 311 (3d Cir. 1996) (determining that so long as there is independent evidence supporting a finding, an adverse inference can be drawn from a party's silence).[9]

Other Trawniki guards have described their duties as involving guarding the Jewish labor camp and escorting Jews to their work sites. The fact that there is no direct evidence that defendant patrolled the perimeter or otherwise helped to guard the Jewish labor camp does

---

[9]Defendant argues that "nothing that [he] has said or done in this proceeding can be characterized as a concession of the facts the government wishes to prove." Def. Mem. at 4. He refused to testify at his deposition "for fear of subsequent foreign criminal prosecution." Id. However, the Supreme Court has held in a case with practically identical circumstances that "concern with foreign prosecution is beyond the scope of the Self-Incrimination Clause" of the Fifth Amendment. United States v. Balsys, 524 U.S. 666, 669, 118 S. Ct. 2218, 141 L. Ed. 2d 575 (1998). Assuredly defendant is aware of this precedent, as his lawyer argued the Balsys case before the Supreme Court. Thus, defendant makes no argument why the court should not draw a negative inference against him from his silence.

17

not diminish the strength of the government's evidence.  However, courts have attributed

actions to an individual based on his membership in a particular organization at a particular

time and have deemed this evidence sufficient to establish that he assisted in the persecution of

civilians.  Kwoczak, 210 F. Supp. 2d at 651; Naujalis v. INS, 240 F.3d 642, 646 (7th Cir.

2001); United States v. Ciurinskas, 148 F.3d 729, 733 (7th Cir. 1998).  Furthermore, the

government's expert historian concluded based on this evidence that defendant as a Trawniki

guard necessarily shared in these duties of persecution.  Given no reason to conclude

otherwise by defendant, the court finds that defendant performed guard duties at the Jewish

labor camp as part of the training regimen he completed there in 1943.

   Defendant argues that the government's proof of his service as a Trawniki guard and

his involvement in persecution lacks credibility and should be subject to cross-examination at

trial.  However, he does not submit a single affidavit affirming his innocence of the acts the

government alleges.  Defendant insists that "[t]he notion that the non-moving party must come

forward and rebut the government's proof with his own evidence or suffer loss of citizenship

has no place in a denaturalization action."  Def. Mem. at 3.  The court disagrees.  The fact

that the government bears a weighty burden in making its case for denaturalization at the

summary judgment stage does not obviate the defendant's obligation to make some sort of

evidentiary showing beyond mere conclusory denials.  See Wasylyk, 162 F. Supp. 2d at 93;

United States v. Dercacz, 530 F. Supp. 2d 1348, 1351 (E.D.N.Y. 1982).  Defendant in effect

asks that the court declare a special summary judgment standard for denaturalization actions.

To allow a defendant to resist summary judgment simply on the strength of an unsworn

statement contradicted by a previous sworn statement and significant circumstantial

18

documentary evidence, however, would go a long way towards vitiating summary judgment in
such cases.[10]  There is no support in the case law for such a proposition.  Defendant cannot
create his own disputed issue of material fact simply with unsworn denials of what the
government alleges.  St. Ledger v. Area Coop. Educ. Servs., 228 F. Supp. 2d 66, 69 (D.
Conn. 2002).

     Deriding the government's evidence as consisting entirely of an investigator's affidavit
and a historian's opinion, defendant claims that the government has not met the stringent
evidentiary burden it bears in denaturalization cases.  Again, the court disagrees.  The so-
called investigator's affidavit, as defendant labels it, is accompanied by a sworn statement in
which defendant admits his service as a Trawniki recruit.  Furthermore, defendant refused to
answer questions concerning his service at Trawniki at his deposition, a recalcitrance from
which the court is entitled to draw a negative inference.  Finally, the opinion of Dr. Black,
whom defendant denounces as "a former [Office of Special Investigations] employee [who]
carries with him the stigma of that office," Def. Mem. at 6, is derived from volumes of
documentary evidence.  Defendant urges the court to discount his narrative and opinion as the

---

[10]If defendant's argument were accepted, the government would be able to move for
summary judgment successfully in denaturalization cases only in instances when the issue in
dispute boils down to one of a narrow universe of legal questions.  See e.g., Breyer, 41 F.3d
at 891 (discussing defendant's argument that he enjoyed derivative citizenship); Schmidt, 923
F.2d at 1257 (discussing defendant's argument that the involuntariness of his service as a Nazi
guard and his lack of personal involvement in committing atrocities serves as a defense to
denaturalization); Wasylyk, 162 F. Supp. 2d at 93 (discussing defendant's lack of personal
involvement defense).  There is no basis in the case law to cabin summary judgment so
restrictively.

products of ostensibly one-sided inquisitorial zeal; beyond this, defendant gives no reason why Dr. Black's opinion does not merit serious consideration.

Defendant's admission that he trained at Trawniki and the documentary evidence detailing the tasks Trawniki trainees performed, which included guarding Jews, constitute clear, convincing and unequivocal evidence that defendant assisted in the persecution of civilians. This evidence is particularly compelling in light of defendant's failure to introduce any contradictory factual evidence. His employment at Trawniki, however involuntary or removed from the direct brutalization of Jews, rendered him ineligible for an immigrant visa under Section 2 of the DPA and therefore mandates denaturalization.

The court does not reach the issue of whether defendant's service in the Deployment Company and the Streibel Battalion also constituted assistance in persecution. The government does not argue that it did. Nor does the evidence in the record prove clearly and convincingly that defendant's service necessarily required the persecution of civilians.

2. Participation in a Hostile Movement

The government contends that defendant's visa was illegally procured in violation of Section 13 of the DPA because he participated in a movement hostile to the United States. The Kwoczak court initially held that service in a Trawniki unit and in the Streibel Battalion does not by itself necessarily mean that a defendant participated in such a movement. Kwoczak, 210 F. Supp. 2d at 651-53. A district court in the Southern District of New York, relying on Kwoczak, ruled similarly. See Reimer, 2002 U.S. Dist. LEXIS 26356, at *31-32. Since then, the Kwoczak court amended its opinion and ruled that the defendant, "from 1942 to 1945, was a member of a movement . . . hostile to the United States - namely, the Trawniki

20

guard unit from 1943 to 1944 and, from 1944 to 1945, Battalion Streibel . . . ."  United States
v. Kwoczak, No. 97 Civ. 5362, at 6 (E.D. Pa. Nov. 1, 2002), attached as Govt. Ex. 62.
There is no need to reach the issue participation in a hostile movement, as the government has
shown by clear and convincing evidence that defendant assisted in the persecution of civilians
and therefore has made its case for summary judgment.

3.  Material Misrepresentations

    The government insists that the evidence in the record clearly and convincingly proves
that defendant made material misrepresentations in the course of procuring his visa and his
naturalization in violation of Section 10 of the DPA.  These material misrepresentations also
rendered defendant ineligible for citizenship under the DPA, the government contends,
therefore making his naturalization unlawful.

    To establish that defendant violated Section 10 when he applied for a visa, "the
Government must show that a willful misrepresentation or concealment was material; a
misrepresentation or concealment is material if it has a natural tendency to influence the
relevant decision-maker's decision.  It is not necessary for the government to prove that
Defendant would not have received a visa if he had not made the misrepresentation or
concealment."  United States v. Demjanjuk, 99 Civ. 1193, 2002 U.S. Dist. LEXIS 6999, at
*78 (N.D.Ohio Feb. 21, 2002), citing Kungys, 485 U.S. 759 at 771.[11]

_____

    [11]In Kungys, the Supreme Court interpreted materiality as it appears in Section 340(a)
of the INA.  Kungys, 485 U.S. at 767 et seq.  Several courts have applied this interpretation
to the materiality requirement in Section 10 of the DPA.  Reimer, 2002 U.S. Dist. LEXIS
26356, at *33; United States v. Ciurinskas, 976 F. Supp. 1167, 1188 (N.D.Ind. 1997), aff'd
148 F.3d 729 (7th Cir. 1998); see also Stelmokas, 100 F.3d at 317 .

As discussed earlier, a person seeking a visa under the DPA was first screened by a DPC case analyst. The analyst would then generate a report compiled from information received from the applicant and his family, as well as information gathered by the United States Army's Counter-Intelligence Corps. DeCapua Aff. ¶ 12. Because "the CIC received no cooperation from local authorities or security agencies in countries under Soviet occupation," "the CIC and DPC were forced to rely more heavily on full disclosure and honesty by the applicants." Id. ¶ 13. Defendant's DPC report makes no mention of any time at Trawniki or with the Deployment Company and the Streibel Battalion. Rather, the case analyst assigned to his case recorded that defendant spent the war years laboring on his father's farm or in a German factory. This history is effectively repeated on defendant's application for a visa. Pl. Ex. 1 at 45. Viewed together, the DPC report and the visa application suggest strongly that defendant willfully mistated his wartime activities and whereabouts to immigration officials. Defendant does not argue to the contrary; indeed, when the government asked him at his deposition whether he knowingly misrepresented his wartime whereabouts and activities, defendant invoked the Fifth Amendment. Pl. Ex. 13 at 35.

It is impossible to reconcile defendant's personal history as recited in the DPC report and in his visa application with his sworn statement recalling his service at Trawniki. In an affidavit, a former member of the DPC affirmed that defendant's concealment of his service in Nazi units would have rendered him ineligible for a visa under Section 10 of the DPA. Id. ¶ 31. The former DPC member further stated that defendant's "misrepresentation regarding his whereabouts alone would have been a disqualifying factor, as the DPA itself rendered ineligible persons who made willful misrepresentations, and the fact that there were many

22

more qualified applicants than available visas would have caused officials to reject applicants caught lying." Id. ¶ 31 n. 4.  Defendant offers nothing to support an opposite conclusion. Thus, the court concludes that his failure to disclose his wartime activities as admitted in his sworn statement would have influenced the DPC case analyst's decision on his application for an immigrant visa and therefore qualifies as a material misrepresentation. E.g., Stelmokas, 100 F.3d at 314 (holding that failure to disclose employment as a Nazi officer and instead give a different employment history constitutes a material misrepresentation).  Accordingly, because defendant was ineligible for a visa under Section 10 of the DPA, his citizenship was illegally procured.

4.  State Department Regulations

Finally, the government argues that State Department regulations in force at the time defendant applied for citizenship forbade the issuance of a visa to him, as, by his SS service, he "advocated or acquiesced in activities or conduct contrary to civilization and human decency on behalf of the Axis countries . . . ." 22 C.F.R. § 53.33.  Because the court rules for the government on counts 1 and 3 of its complaint, there is no reason to reach this argument.

C.  Admissibility of Evidence

Other than with conclusory statements denying the charges alleged against him, defendant opposes the government's motion by challenging the admissibility of his sworn statement and Dr. Black's opinion.  Def. Mem. at 6.  Defendant does not argue why his sworn statement would not admissible as an admission by a party opponent pursuant to Rule 801(d)(2)(A) of the Federal Rules of Evidence.  The basis for defendant's opposition to Dr.

23

Black's opinion - that the authenticity of the documents he relies upon are subject to challenge - is unavailing. Pursuant to Rule 703 of the Federal Rules of Evidence, an expert's opinion may be based on facts or data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject," regardless of the admissibility of the underlying facts or data. F.R.E. 703. Defendant makes no claim that Dr. Black, whose opinion was credited by another court in this circuit, <u>Wasylyk</u>, 162 F. Supp. 2d at 86, used evidence of the sort not usually relied upon by historians in his field.

## CONCLUSION

The government has proven by clear and convincing evidence that defendant assisted in the persecution of civilians during World War II, and that he made material misrepresentations in his application for a visa to immigrate to the United States. Under the DPA, defendant was ineligible to become a United States citizen and therefore illegally procured his immigrant visa. Accordingly, the Clerk of the Court is directed to enter judgment in favor of the government and against the defendant:

(1) revoking the United States citizenship of defendant;

(2) setting aside the April 22, 1957, order of the United States District Court for the Southern District of New York admitting defendant to citizenship; and

(3) canceling Certificate of Naturalization No. 7932752 issued pursuant to that order.

SO ORDERED.

24

Allyne R. Ross
United States District Judge

Dated: August 13, 2003
      Brooklyn, New York

SERVICE LIST:

*Attorneys for the Plaintiff*
Steven J. Kim
United States Attorney's Office
Eastern District of New York
One Pierrepont Plaza, 16th Floor
Brooklyn, New York 11201

Michelle L. Heyer
Office of Special Investigations
Criminal Division, United States Dept. of Justice
10th and Constitution Avenue, NW
Jack Keeney Building, Suite 200
Washington, D.C. 20530

*Attorney for the Defendant*
Ivars Berzins
Ivars Berzins, P.C.
484 West Main Street
Babylon, New York 11702-3000

cc:        Magistrate Judge Pohorelsky